MOUNTAIN LAKE MINING CO. v. MIDWAY IRR. CO. et al.

No. 2583.  Decided March 11, 1915.  Rehearing Denied June 29, 1915. (149 Pac. Rep. 929.)

1. WATERS AND WATER COURSES—WATER RIGHTS—SUIT TO QUIET TITLE—EVIDENCE. In an action to quiet title to water flowing from a tunnel constructed by plaintiff and its predecessor in interest, evidence *held* not to sustain a finding that plaintiff was the owner of all the water issuing from the tunnel over and above a specified quantity. (Page 352.)

2. WATERS AND WATER COURSES—APPROPRIATION OF WATER—"DEVELOPED WATER." "Developed water" is water which is brought to the surface and made available for use by the party claiming the water. (Page 359.)

3. WATERS AND WATER COURSES—DEVELOPED WATER—BURDEN OF PROOF—PRESUMPTION. Where a party goes upon a stream, the waters of which have been appropriated by others, and drives a tunnel into the water shed drained by the stream and in close proximity to the bed of the stream and collects water which he claims to be "developed water," the burden is on him to show by satisfactory proof that the water is in fact developed water. In such case the presumption is, until overcome by satisfactory proof, that the water is tributary to the main steam and the right to its use is vested in the prior appropriators of the stream. (Page 360.)

STRAUP, C. J., dissenting.

Appeal from District Court, Fourth District; *Hon. A. H. Christenson,* Judge.

Action by the Mountain Lake Mining Company against the Midway Irrigation Company and others.

Judgment for plaintiff.  Defendants appeal.

REVERSED AND REMANDED.

*Thurman, Wedgwood & Irvine,* for appellants.

*A. C. Hatch and E. E. Corfman,* for respondents.

## STATEMENT OF FACTS.

Plaintiff brought this action against the Midway Irrigation Company, a corporation, and thirty-six other parties, to quiet title to certain water flowing from a tunnel constructed by it and its predecessor in interest, known as the Mountain Lake tunnel. Plaintiff alleges in its complaint that it is a corporation "engaged in the business of owning, developing, and operating its mines and mining claims in Wasatch, Utah, and Salt Lake Counties, State of Utah, and the drainage of water therefrom and utilizing such water for beneficial purposes and that, in about the year A. D. 1900, plaintiff's predecessors in interest, for the purposes aforesaid, commenced an underground tunnel in and upon its mining claims aforesaid, and from and since said date have continued until the plaintiff now has completed such tunnel for a distance of approximately one mile, all within the mining claims and property of this plaintiff, and that out of said tunnel there is now (August 8, 1910) issuing a large quantity of water, to wit, about fourteen second feet, all of which comes from seepage in its said tunnel and other underground sources, all of which said water is collected and developed by the said tunnel and in and from the mining claims and properties of the plaintiff by means of said tunnel, and all of which said water, other than about one-fourth thereof, had not theretofore found its way to the surface of the earth so as to become a tributary to any known surface stream or water course." Plaintiff also alleges that the defendants claim to be the owners and entitled to the use of all the water issuing from the tunnel, and that they have "diverted and used the same upon their lands for irrigation and other purposes, against the will and without the consent of the plaintiff, and in violation of the rights of the plaintiff," and

that the defendants "threaten to continue their said wrongful and unlawful invasion of the title, possession, and use of the plaintiff to said three-fourths of said water, and to take, divert, and use said three-fourths of said water to the irreparable injury of this plaintiff."

Defendants admit that plaintiff and its predecessor in interest constructed the tunnel mentioned in the complaint and for the purposes therein stated, but allege that the waters encountered in the course of its construction, and that flow from the mouth or portal thereof, were underground streams and seepages that constitute the permanent sources of the waters of a creek known as Snake creek, which "rises on the eastern slope of the Wasatch range of mountains and flows easterly into what is known as Provo Valley, where said waters·are now   *   *   *   and for more than twenty-five years next preceding the commencement of this· action have been used by the defendants and their predecessors in interest for irrigation, ·domestic, and other beneficial purposes; that all of the waters of said creek, as above described, and the water rights pertaining thereto, are, as above stated, owned by these defendants, and the same are necessary and not more than sufficient, when ecomonically used, for the purposes hereinbefore stated."

The record shows that Snake Creek Canyon, down which the water in controversy flows, is from five to eight miles in length, and that the bed of the creek has a ,fall approximately 500 feet per mile.  Respondent's tunnel, the portal of which is within a few feet of Snake Creek, is situated near the head of the canyon and extends into the mountain parallel with the creek bed.  The grade of the tunnel is one and one-half per cent. and the raise from the mouth to the face of the tunnel is from seventy-five to eighty feet; that is, the face of the tunnel is from seventy-five to eighty feet higher than the portal.

W. B. Searle, who was in the employ of, and a witness, for, respondent, testified that he made surveys of respondent's mining claims ,into which the tunnel is driven, and that he is familiar with the drainage area of Snake Creek; that the elevation of Snake Creek (above sea level), at a point opposite

the mouth of the tunnel, is approximately 8,400 feet; that the elevation of the head of Snake Creek canyon under which the tunnel extends, is approximately 1,100 feet; that above and beyond the mouth of the tunnel "there is a slope two ways towards Snake Creek from the northwest and the southwest, varying in height from 2,600 to 1,000 feet"; and that the drainage area of Snake Creek basin or water shed above and beyond the Beuhler Switch, which is 1,575 feet from the mouth of the tunnel, is 470 acres. The evidence also shows, what there is on the point, that at some points on Snake Creek, below the mouth of the tunnel, the distance from the top or crest of one side of the canyon to the crest of the other side is about four miles; that the canyon near its source is narrow, and the crests of the walls or sides thereof are, only a short distance apart.

One witness, who has resided at Midway and has known the canyon practically all of his life (fourty-four years), testified, and his testimony is not disputed, that for "three and one-half miles the walls of the canyon start practically from the side of the creek," and that "there are lots of ravines hills, and canyons up Snake Creek on either side." Several of the ravines and canyons contain water that flows into Snake Creek below the mouth of the tunnel.

William Witt, a witness for respondent, testified that:

"There are four streams of water flowing into Snake Creek between the Mountain Lake tunnel and Lavena Creek. There are seeps along the creek whereby water reaches Snake Creek between Lavena Creek and the Mountain Lake Tunnel other than the streams to which I refer."

Another one of respondent's witnesses, who is a civil engineer, testified that:

"In 1907 the flow of Lavena Creek was two-fifths of the entire flow of Snake Creek below the junction of the two streams. Lavena Creek has always been a large stream."

From the foregoing facts, which are not disputed, it will be observed that Snake Creek and Snake Creek Canyon are typical of many of the small canyons and the streams of water flowing therein in this arid mountain region. It is a matter of common knowledge that the sources of these canyon streams.

are usually near the tops of the mountains in which they are situated and are fed by springs and seepages and by rains and melting snows. When the precipitation of rain and snow at and in the vicinity of the water sheds is plentiful and we have what is known as a "wet season," the volume of water flowing from the springs and seepages is perceptibly greater than it is when the precipitation is light (below normal), and we have what is termed a "dry season." Other climatic conditions, such as what is known as "early" and "late" springs, also have their influence on these mountain streams, especially during the period of low water, which, the evidence shows, usually commences in Snake Creek in the month of July.

In the year 1895 the defendants exchanged the water of one of the tributaries of Snake Creek, known as Pine Creek, for five second feet of water that issues from what is known as the Ontario tunnel. This tunnel water empties into the Provo River and is taken from the river, together with three feet of river water at a point near Midway, and used by stockholders of the Midway Irrigation Company to irrigate their lands. The eight second feet of water diverted from the Provo River (which includes the five second feet of water from the Ontario tunnel) and the waters of Snake Creek constitute defendant's entire supply of water with which they irrigate approximately 4,000 acres of land.

The court found, and the evidence shows, that:

"Said Snake Creek is a natural stream of water rising on the eastern slope of the Wasatch range of mountains west of Provo Valley, in Wasatch County, Utah, and that it flows easterly into said Provo Valley; that it is formed by rains and melting snows and numerous springs and seepages situated along its course that find their way into the channel."

The court also found:

That a large quantity of water, "to wit, about eight second feet, all of which comes from seepage in the said tunnel and other underground sources, and all of which said water is collected, and all thereof, except three and one-half second feet, was and is wholly developed by said tunnel, * * * and all of which said water, other than three and one-half second feet thereof, had not theretofore found its way to the

surface of the earth, so as to become a tributary to any known surface stream of water.''

The court further found, and the evidence shows:

''That in the driving and construction of said tunnel by the plaintiff, at different and various points in said tunnel, considerable water was intercepted; the first considerable flow being encountered at a point in said tunnel know as 'Beuhler's Switch,' being at a point in said tunnel approximately 1,200 feet from its mouth, and, as said tunnel was continued in its course, the quantity of water was increased by other underground water being encountered from time to time, until the tunnel had been driven a total length of approximately one mile, being the point the tunnel had reached at the commencement and at the close of the trial of this case. That in the prosecution of the work in the driving of the said tunnel, as the water was struck at the face, the flow nearer the mouth or portal of said tunnel would, to some extent, diminish, but as the work proceeded, and the tunnel was increased in length, there was a general increase in the total flow of the water therein; that, at the point in said tunnel known as Buehler's Switch, a large quantity of water was encountered, which, when first encountered, burst forth in a large quantity, but it gradually diminished for a number of days, until about one week, when its water had reached its ordinary flow; that in the channel of Snake Creek and in the vicinity of said tunnel were located several springs which had theretofore formed a part of the permanent source of supply of said creek; that when said large quantity of water was struck at and near the Beuhler's Switch in said tunnel, about the year 1902, said springs above mentioned immediately began to diminish in their flow, and that within a short time they entirely ceased to flow, but the water struck at the point in said tunnel known as Beuhler's Switch continued to flow at approximately the same quantity as had theretofore issued from all of said springs, except that as the tunnel was driven into the mountain from the said Beuhler's Switch, and the water was struck further on in the tunnel, the flow of water was diminished to some exent at and near said Beuhler's Switch, and that said springs thus dried up and have since said time remained

permanently dry, and the water from the said tunnel has continued to flow; that the springs thus dried up were from three to six in number, and that the said springs were fed by an underground water course, and that said springs, before being cut off and dried up by the driving of the said tunnel, formed a portion of the permanent supply of water in Snake Creek;  *  *  *  that the stockholders of the defendant corporation Midway Irrigation Company and the other defendants are the owners of land in severalty, situated in and near Midway, Wasatch County, Utah, amounting to approximately 4,000 acres; that the said lands are unproductive without irrigation, but with irrigation are highly productive and valuable; that more than twenty-five years prior to the commencement of the said Mountain Lake Tunnel, various people settled upon said land and appropriated for beneficial uses in irrigating their said land, and for domestic and culinary purposes, all of the water flowing in Snake Creek, and their successors have ever since used said water for the irrigation of said land and other beneficial purposes.''

The court found, as conclusions of law so far as material here:

''That the plaintiff is the owner of all the water issuing from the tunnel over and above three and one-half second feet,  *  *  *  and that plaintiff is entitled to a decree  *  *  *  quieting its title to said excess of said water flowing from said tunnel.''

A decree in conformity with the findings of fact and conclusions of law was entered, and plaintiff was adjudged to be the owner and entitled to the use of all water flowing from the tunnel in excess of three and one-half second feet.

Defendants appeal.

McCARTY, J. (after stating the facts as above).

Appellants earnestly contend that the portion of the court's decision, wherein it is held that all of the water issuing from the Mountain Lake Tunnel in excess of three and one-half second feet was developed and collected by the driving of the tunnel, and is water which had not theretofore found its way to the surface of the earth so as to become a

tributary to or source of supply for any known surface stream, is not only unsupported by, but is contrary to, the evidence. This is the decisive question in the case, and the only one we deem necessary to consider.

The record shows that the construction of the tunnel was begun in 1897. The water at the Beuhler Switch was encountered in 1902.

William J. Knight, a director and the general manager of respondent company, testified that, from a point near the mouth of the tunnel, "there are little streams coming in along until you reach what they call the big spring at the Beuhler Switch." The evidence, without conflict, shows that, when the water at the Beuhler Switch was encountered in the tunnel, the volume was so great that the men driving the tunnel were compelled to suspend work thereon for ten or twelve days, during which time the water gradually receded. And, when work was resumed, a curve was made in the tunnel at the Beuhler Switch to avoid the rush of water coming in at that point.

R. T. Kimball, a witness for the respondent, testified, regarding the flow of water at the Beuhler Switch and a flow encountered in the tunnel about one hundred feet beyond, as follows:

"I saw the flow of water coming from the tunnel after striking water at the Beuhler Switch. * * * When we got the flow of water from the Beuhler Switch, we had a great pressure, then after a while it dropped off. * * * They had to hold up in their work and I was there during the time they were waiting. * * * I should say it was between three weeks and a month before it dropped down to what I call the normal flow. * * * We drove the tunnel somewhere about 300 feet beyond the Beuhler Switch. Within that distance (something less than 100 feet from the switch) we struck another flow of water. Compared to the other it was light." That the water at the Beuhler Switch "diminished, possibly to an amount equal to the water we struck." Q. And then you went about 300 feet and struck another flow? A. We didn't strike a flow, just a little seepage."

354        SUPREME COURT OF UTAH.        [June

Mountain Lake Min. Co. v. Midway Irr. Co. et al., 47 Utah 346.

Work on the tunnel at this point was not resumed until May, the following year (1903).

William Witt, one of respondent's principal witnesses, who was in charge of the operations when work was resumed in the tunnel, testified in part as follows:

"The tunnel was in approximately 180 feet beyond the Beuhler Switch when I commenced. There was a stream of water coming in between the Beuhler Switch and the face of the tunnel when I went there at one place in particular. About thirty feet beyond where this stream of water was when I went there, we struck another flow of water, and the one behind all dried up. I cannot recall another instance where the stream entirely dried up as we prosecuted the work ahead."

Fred Hicken, another of respondent's witnesses, testified:

"I went there in 1903. The tunnel was in about two hundred feet beyond the Beuhler Switch." That there was a stream of water flowing into the tunnel beyond the Beuhler Switch and about fifty feet from the face. That "from this stream to the face water occurred seeping and dripping. From there on I would estimate the tunnel was driven from fifty to one hundred feet. Then we struck a considerable stream coming in through a fissure or crack in the rock. The dripping I referred to dried after we passed the water course. * * * We next struck a considerable flow in one hundred or one hundred and fifty feet. There were drippings before we got to that between the spring we struck before and the one I now speak of, but no water came in in seams or streams. When we struck the next stream the drippings ceased and dried up."

This witness further testified:

"Every fifty or one hundred feet we would come to a water course, some large and some small, and as we passed the streams there would be more or less dripping until we came to the next, and after that water was let into the tunnel through the water course the dripping behind in the main would cease. Not every time, but generally. We struck one in 1907, * * * about 2,500 feet beyond the Beuhler Switch. * * * I could not say whether the water was

coming through seams. It was coming in so thick we didn't care to look."

Regarding the manner in which the water came into the tunnel as the work thereon progressed, whether through seams or fissures in the rocks or from seeps, and the effect the tapping and opening up of a flow of water would have on the preceding streams or seepages, there is no substantial conflict in the evidence.

One of appellant's witnesses, a Mr. Sonderegger, who worked in the tunnel from 1901 to 1910, inclusive, testified on this point in part as follows:

"The water struck at Beuhler Switch flowed with a big rush for about a week and then settled down to its normal size. * * * I was there when the work continued on. We struck some water all along. As we went on it dried up behind us. The water continued to decrease as we opened up new channels of water in prosecuting the work. It decreased behind and at the Beuhler Switch by degrees. For quite a ways on there was quite a quantity of water near the face all the time. When I ceased work there the tunnel was in something over 5,000 feet. The water did not diminish behind as we progressed with the tunnel all the way. In some places the water kept running after we went on. The large flows did not continue the same size. They did not diminish quite as much as the Beuhler spring did."

Ernest Kuhler, another of appellants' witnesses, who worked in the tunnel, testified:

"I commenced work there in 1902. * * * I remember the striking a large flow of water at the Beuhler Switch. * * * There was so much water in there we couldn't do anything. * * * and we never went to work until seven or eight days after that. * * * The flush of water ran off in about ten or twelve days. * * * I worked there about a month after we struck the water at the Beuhler Switch. The next year I began again. We struck more water as we worked beyond the Beuhler Switch. I did not find the Beuhler Switch water flowing when I went back in 1903—not all of it. There had been a change. There was hardly any water in the Beuhler Switch. There was water running

from other places in the tunnel near the face. * * * When I resumed work in 1903, I should judge there was about one-tenth as much water coming from the Beuhler Switch as when it receded to its normal flow after we struck it in 1902. As we prosecuted the work at the tunnel and drove the face in further, the water would diminish, and in certain places it ceased."

Some of the respondent's witnesses, who were connected with the construction of the tunnel, testified that in their opinion, and others testified unqualifiedly, that since 1902, as the work progressed in the tunnel, there was a gradual increase of the flow at the portal of the tunnel.

One witness (Witt) testified that in August, 1907, the tunnel had been driven a little more than 3,000 feet, and at that time more than half of the water issuing from the tunnel was coming from the portion that had been driven since 1903; and that "the quantity coming out of the tunnel in 1909 was easily double what it was in 1903." And again:

"I should judge a second foot of water or more was added after 1907."

Another of respondent's witnesses testified on this point as follows:

"While I was there in 1908, one large (water course) was opened up. * * * It came in at the sides in a stream. This increased the flow of water in the tunnel and the increase continued until I quit."

On the other hand, appellants' witnesses, who were working in the tunnel at the time the flow of water at the Beuhler Switch was encountered and continued working there until the tunnel was driven 1,500 feet or more beyond the switch, testified that in their opinion there was no appreciable increase in the volume of water issuing from the tunnel after it was driven beyond the switch. The probative force however, of the evidence of respondent, regarding the alleged increase in the volume of water in the tunnel since 1907, is very much weakened, if it is not entirely overcome and destroyed, by other evidence adduced by respondent of a much more convincing character. In August, 1907, respondent's employees, under the direction and supervision of a competent civil en-

gineer, W. B. Searle, who also was in the employ of respondent, installed a weir (a device for measuring water) at the mouth of the tunnel, and one of them, W. Witt, measured the water issuing therefrom almost daily from August 17th to and including October 18, 1907. According to those measurements, the correctness of which is not disputed nor in any way challenged, the flow of water from the tunnel August 17th and 18th was 13.25 second feet; on the 19th, 12.89; on the 23d, 11.65; from the 25th to 27th, inclusive, 10.97; on the 31st, 10.29; on September 4th, 9.63. On December 14, 1907, the stream was again measured by respondent's employees, and there was only 4.65 second feet of water issuing from the tunnel. During the month of August, 1911, respondent's employes again measured the water issuing from the tunnel.

W. B. Searle testified that ''measurements were taken each day. From August 15th to the 20th, inclusive, the flow was 7.80'' second feet. The flow therefore, was more than five second feet less than it was on the corresponding dates of 1907. Searle further testified that ''from August 20th to 27th it (the flow) was 7.42'' second feet. This was 3.5 second feet less than flowed from the tunnel on the corresponding dates of 1907. Continuing, the witness said, ''From August 28th to September 1st inclusive it (the flow) was 7.42'' second feet, which was approximately 2.75 second feet less than it was on the corresponding dates in 1907. The witness further testified that the flow ''from September 2d to 4th, inclusive,'' was 7.24 second feet, which was 2.56 second feet less than it was September 2, 1907. These measurements, the correctness of which is vouched for by respondent, and which is not disputed or even questioned by appellants, show conclusively that there has been a decrease of several second feet in the flow of the water from the tunnel since August, 1907. It having been thus shown, by evidence introduced by respondent of the most convincing and conclusive character, that there were several second feet more of water issuing from the tunnel during the months of August and September, 1907, than there was during the same months in 1911, it necessarily follows that the witnesses, who testified that there has been a gradual increase in the flow as the work progressed in the tunnel since 1907, were

mistaken. This evidence also tends to show, in fact it is all but conclusive, that the water encountered in the tunnel since 1907, as the work therein progressed is at least a portion of the same flow that found its way into the tunnel through fissures, cracks, and crevices in the country rock through which the tunnel was driven during the year 1907 and prior thereto.

The trial court found, and respondent, in its complaint, in effect admitted, that a continuous stream of three and one-half second feet flowed from the springs, herein referred to, before the underground flow of this water was intercepted at the Beuhler Switch by the driving of the tunnel. It is therefore determined, so far as respondent's rights are involved in this appeal, that the minimum (the natural) flow of water in this particular underground channel before it was tapped by the draining of the tunnel was three and one-half second feet. Evidence introduced by respondent shows that there were about two second feet coming into the tunnel at and in the vicinity of the Beuhler Switch when work was resumed in the spring of 1903. On August 28, 1911, Mr. Searle, in the interest of respondent, measured the water in the tunnel at a point 85 feet beyond the Beuhler Switch and also measured the stream at the mouth of the tunnel. According to these measurements, the correctness of which is not in dispute, the flow at the point beyond the switch was 6.04 second feet and at the mouth of the tunnel 7.43 second feet, showing that the quantity of water coming into the tunnel between the two points was 1.39 second feet. The decrease of approximately 2.11 second feet, as shown by these measurements in the quantity of water coming into the tunnel at and in the vicinity of the Beuhler Switch since the stream receded to its normal flow at that point in 1902, after the tapping and draining of what seems to have been an underground reservoir, is strong, if not conclusive, proof that the water encountered beyond the Beuhler Switch as the tunnel was driven into the mountain is the same flow that was first encountered at the switch in 1902. In other words, we think that the only reasonable inference that can be drawn from the evidence bearing on this point is that, before the tunnel was extended beyond the Beuhler Switch, the tunnel water in question found its way to that point by flowing,

percolating, and seeping, through the fissures, cracks, and crevices in the rock (the formation) through which the tunnel was driven.

There are two points or propositions upon which respondent mainly relies to uphold the decision of the trial court, wherein it was held that the water awarded respondent was ''developed water,'' namely: (a) That the precipitation on and within the water shed or surface drainage area of Snake creek above the mouth of the tunnel is much less than the quantity of water flowing from the tunnel; (b) that the quantity of water flowing from the tunnel is much greater than the quantity that flowed from the springs before they were dried up by the driving of the tunnel. In regard to the first proposition, we think the only conclusion permissible from the evidence is that the source of a considerable portion of the water flowing from the tunnel is back in the mountains a considerable distance beyond the surface or drainage area of Snake Creek. But, as we have pointed out, the evidence is also all but conclusive that much of the water encountered and collected in the driving of the tunnel beyond the Beuhler Switch, which, at the time of trial, was in about 6,000 feet from the portal, is connected with and forms at least a part of the flow that was first encountered at the switch. It is therefore unimportant whether the source of this underground flow is within the surface of the drainage area of Snake Creek or whether its source is west of and beyond the crest of the mountain that divides the water shed of Snake Creek from the water sheds of other streams located in that particular range of mountains. The important question on this point is: Did the water, or any considerable portion thereof, encountered and collected in the driving of the tunnel beyond the Beuhler Switch, find its way through the openings, fissures, crevices, and seams in the rock into Snake Creek before it was disturbed or interfered with in its underground course or flow by the driving of the tunnel? If it did, it was a tributary of Snake Creek, and the question of whether it is supplied by precipitation within the surface area of a particular watershed is of no consequence. Regarding the second proposition, while there is evidence to support a finding by the court that the quan-     2

tity of water flowing from the tunnel during portions of the year exceeds the amount that flowed from the springs before they were dried up by the driving of the tunnel, there is no evidence from which the amount of the excess, if any, can be determined. It is a well-recognized rule of law in this arid region, that where, as in the case at bar, a party goes upon a stream, the waters of which have been appropriated and put to a beneficial use by others, and drives a tunnel into the mountain or watershed drained by the stream, and immediately under or in close proximity to the stream collects water which he claims to be developed water, he must make satisfactory proof that such water is in fact "developed water." In such case it is immaterial whether the water, when encountered, is flowing in well-defined subterranean channels or is percolating through the soil, gravel, and the fissures and crevices of the rock. In either event, the presumption is, until overcome by satisfactory proof, that the water is tributary to the main stream, and the right to its use is vested in the prior appropriators of the stream.

In 2 Kinney on Irrigation, Section 1206, the rule in    **3** this arid region is stated as follows:

"The burden of proof is upon the one who has discovered certain subterranean water and claiming the same to show that such water is, in fact, 'developed water.' Therefore, whoever asserts that he is entitled to the exclusive use of water by reason of his having discovered and 'developed' the same must assure the court, by a preponderance of the evidence, that he is not intercepting the tributaries of the main stream or other body to the waters of which others are entitled."

In *Smith* v. *Duff*, 102 Pac. 984 (39 Mont. 382, 133 Am. St. Rep. 587), in the syllabus, which correctly reflects the rule as discussed in the body of the opinion, it is said:

"One who asserts a right to the exclusive use of water, by reason of its development by him, must assure the court, by satisfactory proof, that he is not intercepting the supply to which his neighbor is rightly entitled."

In *Moe* v. *Harger*, 10 Idaho, 302, 77 Pac. 645, the court says:

"This court has uniformly adhered to the principle announced

both in the Constitution and by the statute that the first appropri-
ator has the first right; and it would take more than a theory, and,
in fact, clear and convincing evidence, in any given case, showing
that the prior appropriator would not be injured or affected by the
diversion of a subsequent appropriator, before we would depart
from a rule so just and equitable in its application and so generally
and uniformly applied by the courts."

And again, in the same opinion:

"The subsequent appropriator, who claims that such diversion will
not injure the prior appropriator below him, should be required to
establish that fact by clear and convincing evidence."

This doctrine is reaffirmed and adhered to by the Idaho
court in *Josslyn* v. *Daly*, 15 Idaho 137, 96 Pac. 568.   See also,.
2 Wiel on Water Right, Section 1082; *Howcroft* v. *Union &*
*Jordan Irr. Co.*, 25 Utah 311, 71 Pac. 487; *Platte Valley Irr.*
*Co.* v. *Bucher's Irr. M. & Imp. Co.*, 25 Colo. 77, 53 Pac. 334;
*Bucher's M. & Imp. Co.* v. *Farmers Ind. D. Co.*, 31 Colo. 62,
72 Pac. 49.

The controlling, the decisive question in this case is:   Did
respondent, by driving the tunnel and collecting water there-
in, increase the flow of water in Snake Creek; and, if so, to
what extent?   Before inviting attention to the evidence intro-
duced by respondent on this point, which is meager and very
unsatisfactory, we shall briefly refer to the physical condi-
tions at and in the vicinity of the tunnel and along the bed of
the Snake Creek canyon below the tunnel, as they are shown
to exist by undisputed evidence.   The rock (the formation) of
that part of the mountain comprising the watershed or drain-
age area of Snake Creek, where the tunnel is located, contains,
numerous fissures, cracks, and seams through which water
flows, percolates, and seeps.   And it seems that the walls and
bed of the Snake Creek canyon below the tunnel are likewise
cracked and fissured.   In fact, evidence introduced by re-
spondent shows, and the court found, that there are perma-
nent seeps and springs of water along the canyon below the
tunnel.   These fissures, cracks, and seams are so numerous and.
extensive in the vicinity of the tunnel that they constituted:
an underground reservoir of considerable magnitude.   When.
water was first encountered at the Beuhler Switch, it came in--

to the tunnel in such quantities that it washed away the flume and a portion of the dump at the mouth of the tunnel, and respondent was compelled to suspend work in the tunnel until the surplus water contained in the underground reservoir drained off, which required from a week to ten days. This reservoir, which the great preponderance of the evidence shows was fed by numerous streams, percolations, and seeps of water tapped by the driving of the tunnel, being directly under the bed and near the source of Snake Creek, the burden, as hereinbefore stated, was on the respondent to show by satisfactory proof that the waters, if any, flowing from the tunnel in excess of the quantity that flowed from the springs, did not find its way into Snake Creek at some point lower down on the stream. The evidence produced by respondent on this point, as stated, is meager and very unsatisfactory.

C. V. Brooks, a competent civil engineer, was called as a witness by respondent, and testified that on September 13, 1900, he measured the waters of Snake Creek a short distance above where they are diverted by appellants. Quoting:

"The entire flow of the water was over the weir. It amounted to eight second feet."

On cross-examination he said:

"I think it (the dam) was made of earth and rock largely, and some planks. The dam from one end to the other was 140 feet long on top. I think the weir opening was small when I went there. When we went there we found some leaks in it, and we stopped all the leaks that we could. We could not see whether the water was running underneath or not. The weir was rectangular, 6.4 feet long, and the water was .515 of a foot in depth. * * * This was done 11 years ago. I made no notes whatever in regard to the matter, except just a diagram and the width, depth, and opening. I rely wholly upon my recollection. Since that time I have had hundreds of other propositions in mind. I have no notes in regard to how high or how wide the dam or how deep the water was on the upper side of the dam, nor how far the water was flooded back. * * * I do not know the depth of water from the weir down to the creek bed. I do not know the dept of the water below the weir on the upper side. I do not know the distance the

water was flooded back above the normal. I do not know any of those measurements.''

On re-direct:

''My recollection is that the leakage under the dam was very slight, not to exceed half a second foot. * * * Perhaps there was not more than one-tenth of a second foot of water in sight, just a little seepage under the dam.''

J. R. Murdock, a witness for respondent, testified that he assisted in the construction of the weir referred to by the witness Brooks, and that, quoting:

''I examined the weir as carefully as I knew how, and could find no water flowing through the dam or elsewhere, except over the weir. * * * We stopped the water from running through the dam. It was tight. * * . * We blocked it up tight, so as to back the water twenty or thirty feet and force it over a narrow edge of a slab or plank.''

On cross-examination:

''The weir was constructed about two years before Brooks made his measurement. We fell logs across the stream, then filled in with poles. * * * The poles were various sizes, from four to six inches. * * * Then we put in cobble rock, then gravel, and dirt on top of the cobble rock. We went back on the bank and caved it down. The gravel the first day was up about even with the logs. * * * We put in some timber or plank on top of the logs.''

Mr. Van Wagener, a witness for appellants, testified in part as follows:

''I was with Mr. Brooks. The measurement was made with what you call a weir. They placed some poles across, and then threw in some rocks, and then went up the creek and washed some gravel and got an overflow of water. * * * We didn't go to the expense of making a dam that would turn the water. Nobody stopped the cracks in the dam. I have no idea what proportion ran through the dam. I should judge about one-half was going through the dam, or more. I am largely interested in lands irrigated from Snake Creek, and have been for some time.''

On September 8, 1911, 11 years after the waters of Snake Creek were measured by Brooks, C. S. Jarvis, a civil engineer,

· 364        SUPREME COURT OF UTAH.        [June

Mountain Lake Min. Co. v. Midway Irr. Co. et al., 47 Utah 346.

measured the stream above the point where it is diverted by appellants. Jarvis was called as a witness by respondent, and testified that the creek contained 21.62 second feet of water. A tributary of Snake Creek, known as Springer Springs, which contains "something over three second feet" of water, was not included in the measurement made by Jarvis. It will thus be observed that Snake Creek, on September 8, 1911, according to the evidence introduced by respondent, contained more than 24.62 second feet of water. It therefore follows that, if Brooks' testimony shall be accepted as determining the amount of water flowing in Snake Creek September 13, 1900, there has been an increase in the stream since that date of more than 16.62 second feet. But unfortunately for respondent's theory of the case, namely, that the alleged increase, or a considerable portion thereof, was produced by the driving of the tunnel, the measurement made by Jarvis September 8, 1911, when considered in connection with other facts which are not in dispute, shows conclusively that Brooks was mistaken as to the quantity of water in the creek September 13, 1900, and thereby completely destroys the effect (the probative force) of his evidence. According to the testimony of Brooks, the entire flow of the water in Snake Creek September 13, 1900, a short distance above the point where it is diverted by appellants, was eight second feet. On September 4, 1911, the quantity of water flowing from the tunnel was 7.24 second feet. The court, in its decision, held that of this amount three and one-half second feet found its way into and was tributary of Snake Creek before the tunnel or any part thereof was constructed. Therefore, according to respondent's theory of the case, which was undoubtedly also the theory of the court, there were only 3.75 second feet of "developed water" flowing from the tunnel on the last-mentioned date (September 4, 1911). This quantity of developed water would increase the flow in Snake Creek (assuming for the moment that there were eight second feet only on September 13, 1900) from 8 to 11.75 second feet. And we would have, if we should adopt the theory of respondent, an increase in the flow of water in Snake Creek of 12.87 second feet since September 13, 1900, due to causes other than the driving of the

tunnel. No claim is made, nor is there a scintilla of evidence tending to show that there has been any perceptible increase in the stream since said date, except the alleged increase produced by the tunnel water. The measurements made by Jarvis during the progress of the trial, not being in dispute, must be accepted as substantially correct.

Respondent's evidence shows (and it is the only evidence on the point) that Lavena Creek furnishes two-fifths of the entire flow of Snake Creek. Assuming, for the purpose of illustration, that there were eight second feet of water only in Snake Creek September 13, 1900. Two-fifths of this amount would be 3.2 second feet, the quantity flowing in Lavena Creek. Respondent's measurements of Snake Creek show, as hereinbefore stated, that there were 24.62 second feet flowing in this creek September 8, 1911. Two-fifths of this amount is approximately 9.83 second feet, the quantity flowing in Lavena Creek. That is, Lavena Creek, if Brooks' evidence respecting the quantity of water flowing in Snake Creek in 1900 is to be accepted, contained more water in 1911 than did Snake Creek and all of its tributaries, including Lavena Creek, in September, 1900. This is contrary to the evidence of all the other witnesses regarding the quantity of water in Snake Creek. There is other evidence of a very persuasive, if not convincing, character (evidence that is not disputed, except by the inferences drawn by respondent's counsel as to the effect of the tunnel water on the stream), tending to show that there has been no perceptible increase in the waters of Snake Creek since the year 1900.

Sixteen witnesses, all of whom are, and for many years have been, residents of Midway, Wasatch County, and who are owners of farming lands that are, and for many years have been, irrigated with water diverted from Snake Creek, testified that they have observed the stream during each and every irrigation season since the year 1900, and have personally used water therefrom to irrigate their farms, and that there has been no perceptible increase in the stream during that period. Counsel for respondent invite attention to the fact that some of these witnesses are parties defendant to the action, and that those who are not made parties are stockholders in the

Midway Irrigation Company and are therefore directly interested in the action, and hence their testimony, if we correctly understand counsel's position, should be given but little, if any, weight. No attempt was made to impeach any of these witnesses. Their testimony is not disputed, and there is nothing in their manner of testifying so far as the record discloses, that would justify any court, under the circumstances, in refusing to give credence to their testimony on this point. Moreover, the evidence shows, and the court found, that appellants and their predecessors in interest have, for more than twenty-five years, irrigated approximately 4,000 acres of land, "and that the whole of the waters of said Snake creek with its tributaries was and is during the irrigation season, to wit, from April 1st to October 1st of each and every year, necessary and essential to the use of the defendants for irrigation of their lands and for domestic and culinary purposes, and is not more than sufficient, when economically used, for the purposes above stated." The undisputed evidence also shows that the duty of water on these lands is one second foot of water to each one hundred acres. That is, it requires one second foot of water to properly irrigate 100 acres of land. On July 28 and 29, 1911, measurements were made of all the waters of the several streams that flow into and from Snake Creek, including the water that issues from the tunnel, and the aggregate amount was 29.22 second feet. This quantity, together with the eight second feet taken from Provo River (which includes the Ontario tunnel water), gave appellants 37.22 second feet, or nearly one second foot for each one hundred acres of the irrigated lands under the Midway Irrigation Company's system. The evidence without conflict also shows that the waters of Snake Creek are and have been, since the year 1900, divided into twelve "irrigating" streams during the irrigation season, and that each of these streams contains from two to three and one-half second feet of water, the quantity varying with the season.

We have carefully examined the record and have been unable to find any substantial evidence tending to show that there has been an appreciable, or any, increase in the flow of the water in Snake Creek since the year 1900, but we find an

abundance of evidence of the most conclusive character show-
ing that there has been no increase in the stream.

The case is remanded, with directions to the trial court to
vacate and set aside the decree entered herein and to modify
the findings of fact and the conclusions of law heretofore
made and filed in the cause to conform to the views herein ex-
pressed and to enter a decree quieting the title to all of the
water of Snake Creek and its tributaries, including the water
issuing from the tunnel in appellants. Appellants to recover
their taxable costs.

FRICK, J., concurring.

After much hesitation I concur in the reversal of the judg-
ment. I, however, do not concur for the reasons nor upon the
grounds stated by Mr. Justice McCARTY. My concurrence
is based upon the sole ground that under the pleadings, as well
as under the facts and circumstances, the burden of proof
rested upon the respondents to show that the water they
claimed, or at least a portion thereof, was what in law consti-
tutes developed water.

By developed water I mean water that would not have run
to waste or would have remained stationary or concealed be-
neath the surface of the ground, but that it was water which
was brought to the surface and made available for use by
the respondents. 2 Kinney on Irrigation, 2186, 2187. While,
under the evidence and circumstances or this case,
I am forced to believe that, in running the tunnel
into the mountain for a distance of over 5,000 feet, the de-
fendants increased the quantity of water at least temporarily,
yet I am unable to say, from all the evidence, whether such
increase is permanent, or even to say definitely what the
amount of the increase was. The burden was on respondents
to show and make evident these things, and I am of the opin-
ion that they have not done so. It is a matter of common
knowledge that in this mountainous region the water which
percolates into and through the porous soil of the mountains,
especially in the higher altitudes, at some time and in some
manner finds its way into the mountain streams. Merely to
drive a tunnel into a mountain therefore, into which and from

which a considerable quantity of water flows, is not even persuasive evidence that the water thus flowing from such a tunnel is what is termed developed water, within the perview of the law. In order to authorize a finding that the water encountered in such a tunnel is actually developed water, the proof, in my judgment, should be reasonably strong and clear. The proof in this case is not of that character. The only conslusion I am able to arrive at, therefore, is that the evidence does not sustain the finding that the respondents developed all the water, except the three second feet which they allowed to appellants, but in my judgment the amount that the respondents have developed, as well as whether it is permanent or not, is left in serious doubt. Under such circumstances, respondents are not entitled to maintain the judgment. Personally I should have preferred to have remanded the cause to the district court, with directions to set aside its present findings and to hear further evidence, and then make new findings upon the following question, namely: How much have the respondents added to the permanent flow of the stream from which appellants derive their supply up to the time of the hearing? If the court finds that they have added any, then that amount would constitute developed water to which respondents are as much entitled as are appellants to the water they have appropriated from the stream into which the tunnel in question now drains. I have felt constrained, however, to yield my judgment to that of my Associate, Mr. Justice McCARTY, and therefore concur in the reversal of the judgment only for the reasons and upon the grounds stated. I do this with less hesitancy, because in doing so I am less likely to inflict injury upon any one man than if the judgment were affirmed. It is possible that the water coming out of the tunnel may temporarily have increased the flow of the stream, but it is equally possible, even quite probable, that there is no permanent increase of water, and hence, if the water were given to respondents, it would result in taking what belongs to the appellants. It is this peculiar feature of the case that has caused me to hesitate in this matter, and finally to concur.

STRAUP, C. J.

I dissent. The defendants are entitled to all the waters in the canyon which from springs and subterranean courses and channels, and left alone, naturally would find their way and flow in Snake Creek below the tunnel. Other waters encountered and developed by the plaintiff in the construction of its tunnel and flowing therefrom belong to the plaintiff. There seems to be no dispute as to this. About all the question of law involved is that of burden of proof. Because of the pleadings and of its demands, the plaintiff, let it be conceded, had the burden, not only of going forward, but also of establishing its alleged ownership of the disputed waters, and of the defendants' alleged invasion and interference. The case was tried on that theory. That is not what divides the parties. The controlling and determinative questions are of fact. Of the waters flowing from the tunnel, the plaintiff, by its pleadings, admits that the defendants are entitled to a one-fourth thereof. The defendants claim the whole of them. The court awarded them three and one-half second feet, and awarded the remainder of the waters flowing from the tunnel to the plaintiff. These findings the defendants assail and urge are not supported by and are contrary to the evidence. The defendants on this appeal have the burden to show that. I think they have not sustained it. It is not enough that they point to some evidence which supports their claim. To prevail, they are required to show that the findings are against the evidence, or so clearly against the greater weight of it as to show manifest error. This, in my judgment, they have not done.

They admittedly are entitled to some of the waters from the tunnel. That they are not entitled to all of it is, I think, beyond controversy. For I think it clearly established that the plaintiff in running the tunnel more than a mile, 400 or 500 feet beyond the crest of the mountain, encountered and developed some water which, if left alone, naturally would not flow in Snake Creek below the tunnel. Though it should be conceded that the defendants are entitled to more water from the tunnel than was awarded them, yet I think it a greater wrong to give them all of it and none to the plaintiff.

On a trial *de novo* on the record the difficult question of determination is: How much of the waters of the tunnel belong to the defendants, and how much to the plaintiff? The court found there were about eight second feet of water flowing from the tunnel, and that all of it, but three and one-half second feet, were seepage waters and waters developed from underground sources, which had not, until developed by the plaintiff, theretofore found their way to the surface. I think there is good evidence to show the amount of water flowing from the tunnel, and that at least some of it is seepage water and developed as found by the court. There also is good evidence to show that the quantity of water which flowed in Snake Creek below the tunnel, and before the tunnel was constructed, was about eight second feet. That is shown by measurements then made. Measurements at the same place after the construction of the tunnel show the flow with the waters from the tunnel to be about nineteen second feet; and, as I think, there is other evidence to show that the defendants, with the three and one-half second feet awarded them, have all the water they had before the construction of the tunnel. True, defendants testified to the contrary, not from measurements, but from observation and comparison; what they noticed. Most of them were asked if they noticed or observed any difference as to the quantity of water in Snake Creek before and after the construction of the tunnel. They answered that they did not. Conceding, as I do, that that is good evidence, yet I do not see wherein it is more reliable and trustworthy than that given by plaintiff's witnesses, who made the measurements. I think, on the record, the most that ought to be said is that the evidence, as to the quantity of water from the tunnel and to which the respective parties are entitled, is in conflict. In view of that, I think the trial court was in a better position to ascertain the real facts from hearing and observing the witnesses than are we on the record.

I think there is evidence to support the findings; and, on a review of the record, I am not prepared to say that they are against the clear and manifest weight of the evidence. Hence I think the judgment should be affirmed. And I do think that, on the record, findings and judgment that the plaintiff is not

entitled to any of the waters from the tunnel are clearly wrong as being against the evidence.